# United States Court of Appeals
## For the First Circuit

---

Nos. 23-2036, 23-2049, 23-2050, 23-2052, 23-2053, 23-2054, 23-2057

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING
CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY
(PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE OF THE PUERTO RICO
PUBLIC BUILDINGS AUTHORITY,

Debtors,

---

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
representative of the Puerto Rico Electric Power Authority;
PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL
TITLE III DEBTORS,

Plaintiffs, Appellees/Cross-Appellants,

CORTLAND CAPITAL MARKET SERVICES LLC, as Administrative Agent;
SOLA LTD.; SOLUS OPPORTUNITIES FUND 5 LP; ULTRA MASTER LTD.;
ULTRA NB LCC; UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y
RIEGO INC. (UTIER); SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA
AUTORIDAD DE ENERGIA ELECTICA (SREAEE),

Plaintiffs, Appellees,

v.

U.S. BANK NATIONAL ASSOCIATION, as Trustee; ASSURED GUARANTY

CORP.; ASSURED GUARANTY MUNICIPAL CORP.; GOLDENTREE ASSET
MANAGEMENT LP; SYNCORA GUARANTEE, INC.; ALLIANCEBERNSTEIN L.P.;
ARISTEIA CAPITAL, L.L.C.; CAPITAL RESEARCH AND MANAGEMENT
COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISORS, LLC; DELAWARE
MANAGEMENT COMPANY, a series of Macquarie Investment Management
Business Trust; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN
SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; MACKAY
SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; RUSSELL
INVESTMENT COMPANY; SIG STRUCTURED PRODUCTS, LCC; T. ROWE PRICE;
TOWER BAY ASSET MANAGEMENT,

Defendants, Appellants/Cross-Appellees,

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; BLACK ROCK
FINANCIAL MANAGEMENT, INC.; FRANKLIN ADVISERS, INC.; NUVEEN
ASSET MANAGEMENT, LCC; TACONIC CAPITAL ADVISORS L.P.; WHITEBOX
ADVISORS LLC,

Defendants, Appellees.

───────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Hon. Laura Taylor Swain,* U.S. District Judge

───────────────

Before

Kayatta, Howard, and Rikelman,
Circuit Judges.

───────────────

Martin J. Bienenstock, with whom Mark D. Harris, Margaret A.
Dale, Dietrich L. Snell, Ehud Barak, Shiloh Rainwater, Henrique N.
Carneiro, Timothy W. Mungovan, John E. Roberts, Elliot R. Stevens,
Lucas Kowalczyk, and Proskauer Rose LLP were on brief, for
appellee/cross-appellant the Financial Oversight and Management
Board for Puerto Rico, as representative of the Puerto Rico
Electric Power Authority.
    Peter Friedman, with whom Maria J. DiConza, Elizabeth L.
McKeen, Ashley M. Pavel, Jason Zarrow, O'Melveny & Myers LLP, Luis
C. Marini-Biaggi, Carolina Velaz-Rivero, and Marini Pietrantoni

───────────────

* Of the Southern District of New York, sitting by
designation.

Muñiz LLC were on brief, for appellee/cross-appellant the Puerto Rico Fiscal Agency and Financial Advisory Authority.

Pedro A. Jimenez, with whom Luc A. Despins, Eric D. Stolze, Stephen B. Kinnaird, Stephen Sepinuck, Paul Hastings LLP, Juan J. Casillas Ayala, Israel Fernández Rodríguez, Juan C. Nieves González, and Casillas, Santiago & Torres LLC were on brief, for appellee/cross-appellant The Official Committee of Unsecured Creditors of All Title III Debtors.

Richard G. Mason, Amy R. Wolf, Emil A. Kleinhaus, Angela K. Herring, Michael H. Cassel, Wachtell, Lipton, Rosen & Katz, Nayuan Zouairabani, Victoria Rivera Llorens, and McConnell Valdés LLC on brief for appellee Cortland Capital Market Services LLC.

Sarah E. Phillips, Simpson Thacher & Bartlett LLP, Jose L. Ramirez-Coll, and Antonetti Montalvo & Ramirez Coll on brief for appellees SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD, and Ultra NB LLC.

Michael C. McCarthy and Maslon LLP on brief for appellant/cross-appellee U.S. Bank National Association.

Matthew D. McGill, with whom Jeremy M. Christiansen, Lochlan F. Shelfer, Gibson, Dunn & Crutcher LLP, Howard R. Hawkins, Jr., Mark C. Ellenberg, Casey J. Servais, William J. Natbony, Thomas J. Curtin, Cadwalader, Wickersham & Taft LLP, Heriberto Burgos Perez, Ricardo F. Casellas-Sánchez, Diana Pérez-Seda, and Casellas Alcover & Burgos P.S.C. were on brief, for appellants/cross-appellees Assured Guaranty Corp. and Assured Guaranty Municipal Corp.

Glenn M. Kurtz, with whom Claudine Columbres, Isaac Glassman, Thomas E. MacWright, Thomas E. Lauria, John K. Cunningham, Keith Wofford, Michael C. Shepherd, Jesse L. Green, White & Case LLP, and Lydia M. Ramos Cruz were on brief, for appellant/cross-appellee GoldenTree Asset Management LP.

Susheel Kirpalani, Eric Kay, Quinn Emanuel Urquhart & Sullivan, LLP, Rafael Escalera, Carlos R. Rivera-Ortiz, and Reichard & Escalera on brief for appellant/cross-appellee Syncora Guarantee, Inc.

G. Eric Brunstad, Jr., with whom Stephen D. Zide, David A. Herman, Dechert LLP, Dora L. Monserrate-Peñagarícano, Fernando J. Gierbolini-González, Richard J. Schell, and Monserrate Simonet & Gierbolini, LLC were on brief, for appellants/cross-appellees Massachusetts Financial Services Company, Capital Research and Management Company, Aristeia Capital, LLC, AllianceBernstein L.P., Columbia Management Investment Advisers, LLC, Delaware Management Company, Ellington Management Group, L.L.C., Goldman Sachs Asset Management L.P., MacKay Shields LLC, Russell Investment Company, SIG Structured Products, LLC, T. Rowe Price and Tower Bay Asset Management.

Kevin Carroll, Laura E. Appleby, Kyle R. Hosmer, and Faegre

Drinker Biddle & Reath LLP on brief for Securities Industry and Financial Markets Association, amicus curiae.

Jason S. Miyares, Attorney General of Virginia, Andrew N. Ferguson, Solicitor General of Virginia, Kevin M. Gallagher, Deputy Solicitor General of Virginia, Brendan T. Chestnut, Special Assistant to the Solicitor General of Virginia, Steve Marshall, Attorney General of Alabama, Christopher M. Carr, Attorney General of Georgia, Kris Kobach, Attorney General of Kansas, Michael T. Hilgers, Attorney General of Nebraska, Gentner F. Drummond, Attorney General of Oklahoma, Ken Paxton, Attorney General of Texas, Patrick Morrisey, Attorney General of West Virginia, Ashley Moody, Attorney General of Florida, Brenna Bird, Attorney General of Iowa, Austin Knudsen, Attorney General of Montana, Dave Yost, Attorney General of Ohio, Alan Wilson, Attorney General of South Carolina, Sean D. Reyes, Attorney General of Utah, on brief for the Commonwealth of Virginia and 13 Other States, amici curiae.

---

June 12, 2024

---

KAYATTA, **Circuit Judge**.  In this opinion, we consider the rights of parties holding certain revenue bonds, which were issued by the Puerto Rico Electric Power Authority ("PREPA" or "the Authority") before it entered reorganization proceedings under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  48 U.S.C. §§ 2161–78.  We hold that these bondholders have a non-recourse claim on PREPA's estate for the principal amount of the bonds, plus matured interest.  We also hold that this claim is secured by PREPA's Net Revenues -- as that term is defined by the underlying bond agreement -- and by liens on certain funds created by that bond agreement.  We do not decide what effect, if any, confirmation of a plan of reorganization will have on the bondholders' security interest, nor do we attempt to estimate the economic value of that security interest.  Our reasoning follows.

## I.

### A.

Puerto Rico passed the Puerto Rico Electric Power Authority Act ("Authority Act") in 1941.  See P.R. Laws Ann. tit. 22, § 191.  The Authority Act created PREPA, a public electric utility.  Id. § 193(a).  More than eighty years later, PREPA remains the "sole electric utility in Puerto Rico." Puerto Rico Electric Power Authority (PREPA), P.R. Fiscal Agency & Fin. Advisory Auth., https://perma.cc/F7HA-QNVH.  It owns electrical

generation, transmission, and distribution assets in the Commonwealth, and serves around 1.5 million customers. Id.

The Authority Act permits PREPA to raise money by issuing revenue bonds secured by its "entire gross or net revenues and present or future income." P.R. Laws Ann. tit. 22, § 206(e)(1); see also id. § 196(o). In this manner, PREPA can raise money without granting a lien on its physical assets, such as power plants or transmission lines. Pursuant to the Authority Act, PREPA in 1974 executed the Trust Agreement with First National City Bank, which was then acting as trustee.[1] Under the Trust Agreement, PREPA raised money to finance its system by issuing revenue bonds (the "Revenue Bonds"). PREPA promised to repay the bondholders over time,[2] in accordance with the Trust Agreement. Several articles of the Trust Agreement frame the issue before us.

First, the Trust Agreement opens with a Preamble,[3] the text and meaning of which we discuss in detail in Part II.A.1 of this opinion.

_____

[1] The current trustee is U.S. Bank National Association (to which we refer as the "Trustee").

[2] The lower-case phrase "the bondholders" refers generally to the creditors that loaned PREPA money under the Trust Agreement. When specifically discussing the bondholders and insurers that are parties in this action, we use the capitalized term "Bondholders."

[3] The Bondholders propose different labels for this provision, such as the "Now, Therefore paragraph," or the "Granting Clause." While we opt for the simpler "Preamble," our choice of

Second, Article I of the Trust Agreement defines key terms, including "Revenues" and "Net Revenues." PREPA's "Revenues" are (1) "all moneys received by [PREPA] in connection with or as a result of its ownership or operation" of its electricity generation and distribution system, (2) "any proceeds of use and occupancy insurance on the System or any part thereof, and (3) "income from investments made under" either the Trust Agreement or a 1947 predecessor agreement.[4] PREPA's "Net Revenues" are any Revenues remaining after deducting reasonable and necessary operating expenses. Article I also defines the phrase "Opinion of Counsel," which means any opinion filed by PREPA's counsel to "authenticate bonds under [the Trust] Agreement."

Third, Article V of the Trust Agreement establishes a "waterfall" structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds. The Revenues first flow into the General Fund.[5] PREPA pays its reasonable operating expenses ("Current Expenses") out of the General Fund. The remaining dollars -- the Net Revenues -- then flow into the

_____

label does not bear on whether the provision is operative or prefatory.

[4] The Trust Agreement carved out several forms of investment income from this definition. Those exceptions are not relevant to this case, so we do not detail them here.

[5] This excludes investment income, certain types of which qualify as "Revenue" but nevertheless do not flow into the General Fund.

- 7 -

Revenue Fund, minus a reserve to cover future operating expenses. From there, Net Revenues flow first into the Sinking Fund, and then into a series of Subordinate Funds. The Net Revenues deposited into the Sinking Fund cover debt service. The Net Revenues deposited into the Subordinate Funds cover internal PREPA operations, such as extraordinary repairs or capital improvements.

There are four Subordinate Funds: the Construction Fund,[6] the Self-Insurance Fund, the Capital Improvement Fund, and the Reserve Maintenance Fund. If there is not enough money in the Sinking Fund to cover PREPA's debt service obligations, Article V (specifically, sections 512 through 512B) broadly requires PREPA to draw on the Subordinate Funds -- other than the Construction Fund -- to pay bondholders.

Fourth, and relatedly, Articles IV and V grant security interests in certain funds both within and outside of the waterfall structure described in Article V. Section 401 of the Trust Agreement creates a "lien and charge in favor of the [bondholders]" in moneys residing in the Construction Fund. Similarly, under section 507 of the Trust Agreement, the moneys in the Sinking Fund and remaining Subordinate Funds -- that is, the Subordinate Funds

---

[6] The Construction Fund is not technically part of the waterfall structure established in Article V. Instead, the Construction Fund is replenished by bond proceeds and certain Net Revenues preemptively siphoned off from the Revenue Fund. For the sake of simplicity, however, we include it in the broader category of Subordinate Funds.

within the Article V waterfall -- are "subject to a lien and charge in favor of the [bondholders]."[7]   Section 513 confirms that the Sinking Fund moneys are "pledged to and charged with" debt service payments to the bondholders.

Fifth, Article VI of the Trust Agreement specifies how PREPA should hold and invest the moneys it receives.  Specifically, section 601 of the Trust Agreement states that:

> All moneys received by the Authority under the provisions of this Agreement shall be deposited with a Depositary or Depositaries, shall be held in trust, shall be applied only in accordance with the provisions of this Agreement and shall not be subject to lien or attachment by any creditor of the Authority.

Sixth, Article VII of the Trust Agreement outlines specific contractual covenants between the bondholders and PREPA.  In section 701, PREPA covenants that it will "promptly pay the principal of and the interest on" the Revenue Bonds.  PREPA also covenants that the Revenue Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified."  In sections 705 and 712, PREPA also agrees not to create -- "or suffer to be created" -- any lien or charge on "the Revenues ranking equally with or prior to the [Revenue Bonds]."

---

[7]  Sections 401 and 507 both grant a lien to the Trustee, not the bondholders.  But those sections confirm that this lien is for the benefit of the bondholders.

Finally, Article VIII of the Trust Agreement outlines the bondholders' remedies.  Section 804 permits the bondholders to file a suit "in equity or at law . . . for the appointment of a receiver as authorized by the Authority Act[,] or for the specific performance of any covenant or agreement contained herein."  The same provision entitles the bondholders to "recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid . . . and to collect (but solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable."

### B.

In 2017, PREPA defaulted on its fundamental obligations under the Trust Agreement, including its obligation to pay the bondholders.  But for the passage of PROMESA, the Trustee and/or the bondholders could have pursued various remedies authorized by the Authority Act and the Trust Agreement.  Those remedies include suits at law and/or equity to enforce contractual covenants, to obtain an accounting, and to place PREPA in receivership.  P.R. Laws Ann. tit. 22, §§ 207(a)-(b), 208(a)(1)-(3).

Congress, however, changed all this by enacting PROMESA.  Among other things, PROMESA created the Financial Oversight and Management Board ("FOMB" or "Board").  48 U.S.C. § 2121(b)(1).

PROMESA empowered the Board to place Commonwealth entities into bankruptcy-type restructuring proceedings (often called "Title III proceedings"), which resemble municipal bankruptcy proceedings under Chapter 9 of the Bankruptcy Code.  In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 121, 124–25 (1st Cir. 2019); see generally 48 U.S.C. § 2161(a) (incorporating broad swaths of the Bankruptcy Code into PROMESA).  In July 2017, the Board commenced a Title III proceeding in district court (also called the "Title III court") to restructure PREPA.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 899 F.3d 13, 18 (1st Cir. 2018).  As a result, the bondholders' ability to pursue any remedies against PREPA under Commonwealth law was automatically stayed.  See 48 U.S.C. § 2161(a) (incorporating section 362 of the Bankruptcy Code into PROMESA); 11 U.S.C. § 362(a) (stating that a bankruptcy petition automatically stays actions against the debtor's estate).

After two years of on-and-off negotiations and skirmishes, the Board filed an adversary proceeding within the Title III restructuring proceeding.  The purpose of the adversary proceeding was to define the rights and remedies that bondholders had against PREPA.  After the parties negotiated a restructuring agreement for PREPA in 2019, the Board agreed not to prosecute the adversary proceeding.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 91 F.4th 501, 506 n.3 (1st Cir. 2024).  The Commonwealth's government unilaterally terminated the restructuring agreement in

March 2022, so the Board moved to revive its original complaint. Id. at 506. The Board filed its amended complaint in October of that year, and this remains the operative complaint for purposes of this appeal. The amended complaint included three allegations that are relevant here.

First, the Board alleged that bondholders only had security interests in moneys deposited in the Sinking or Subordinate Funds. According to the Board, bondholders did not have a security interest in PREPA's current or future Revenues/Net Revenues, unless those Revenues/Net Revenues resided in the Sinking or Subordinate Funds. Second, the Board alleged that bondholders only had perfected security interests in the Sinking Fund and one of the Subordinate Funds (i.e., the Self-Insurance Fund), meaning the Board could avoid the remaining unperfected interests pursuant to 11 U.S.C. § 544(a). Finally, the complaint alleged that the Revenue Bonds were non-recourse, meaning bondholders could only recover owed moneys from the liened Funds, rather than any other part of PREPA's estate.

The bondholders that are parties to this case (again, "the Bondholders") filed an answer denying the Board's allegations. The Bondholders also filed a counterclaim. Among other things, the counterclaim alleged that PREPA had misappropriated moneys "for uses other than Current Expenses instead of paying [the] [B]ondholders," and had therefore breached

its obligations to hold "all moneys received under the provisions of the Trust Agreement in trust for the benefit of the [B]ondholders." The Bondholders asked for a declaratory judgment that PREPA was in breach of trust, and an "order requiring an accounting of PREPA's revenues" pursuant to P.R. Laws Ann. tit. 22, § 208(a)(2). According to the Bondholders, this "accounting" would require equitable disgorgement of any moneys that PREPA wrongly diverted from the Sinking and/or Subordinate Funds.

**c.**

On March 22, 2023, the Title III court issued a partial summary judgment order in the adversary proceeding. First, the court agreed with the Board that the Trust Agreement only granted the Bondholders security interests in "moneys actually deposited to the Sinking Fund and the [Subordinate Funds]." The Trust Agreement did not grant a broader security interest in PREPA's current or future Revenues (or Net Revenues). Second, the court concluded that the Board could avoid any unperfected security interests under 11 U.S.C. § 544(a).[8] Third, the Title III court rejected the Board's argument that the Revenue Bonds were

_____

[8] The parties have since stipulated that the Bondholders' security interests in the Reserve Maintenance Fund, the Capital Improvement Fund, and the Construction Fund are unperfected. There is one notable exception to this stipulation: The Bondholders may still argue that they have a perfected security interest in PREPA's Revenues, and that this perfection extends to the moneys in these Subordinate Funds.

non-recourse, holding instead that the Bondholders could sue PREPA to recover moneys outside the Sinking and Subordinate Funds.

With respect to the non-recourse holding, the Title III court emphasized that even though the Bondholders lacked a security interest in PREPA's Revenues or Net Revenues, section 804 of the Trust Agreement still permitted them to seek a court order forcing PREPA to divert moneys into the Sinking Fund. Recall that section 804 authorized any bondholder to sue in law or equity for the "specific performance of any covenant or agreement contained" in the Trust Agreement. In the court's view, the existence of this equitable specific performance remedy gave bondholders an unsecured deficiency claim on PREPA's Net Revenues. The precise amount of this claim would "aris[e] from liquidation of the value of the Trust Agreement's equitable remedies related to specific performance." A court may -- for purposes of claim allowance -- estimate a claim in bankruptcy "arising from a right to an equitable remedy for breach of performance." 11 U.S.C. § 502(c)(2). The Title III court applied that provision, estimating the specific performance remedy (and therefore the unsecured claim on Net Revenues) at around $2.4 billion.

The court's partial summary judgment order did not reach the Bondholders' trust-related arguments. But its final summary judgment order, which it issued on November 28, 2023, did. There, the Title III court concluded that the Bondholders had failed to

state a claim for breach of trust.  It also rejected their related demand that PREPA equitably disgorge, via an "accounting," any misappropriated moneys pursuant to P.R. Laws Ann. tit. 22, § 208(a)(2).  The court found that PREPA was not a trustee under the plain language of the Trust Agreement, and that an "accounting" under the Authority Act did not require the sweeping restitution remedy the Bondholders requested.

### D.

Upon issuance of the Title III court's final summary judgment order, the Bondholders filed separate notices of appeal.  The Bondholders challenged the Title III court's findings that they lacked a security interest in PREPA's current or future Revenues or Net Revenues; that any such interest was potentially avoidable under 11 U.S.C. § 544(a); that they had failed to state a claim for breach of trust; and that they were not entitled to an "accounting" of misappropriated PREPA moneys.  The Bondholders also challenged the Title III court's estimation order, arguing that the court erred by allowing an unsecured claim of $2.4 billion, rather than almost $9 billion (i.e., the face value of the Revenue Bonds).  Alternatively, the Bondholders challenged the estimation order's methodology.

The Board and associated plaintiff-appellees -- specifically the Official Committee of Unsecured Creditors ("Committee") and the Puerto Rico Fiscal Agency and Financial

Advisory Authority ("AAFAF") -- cross-appealed.  In addition to rejecting the Bondholders' arguments, the Board and its allies argued that the Title III court erred in allowing any unsecured claim at all on PREPA's Net Revenues.  In the Board's view, the Revenue Bonds were non-recourse, so the Bondholders could only recover from their collateral, i.e., the moneys in the Sinking and Subordinate Funds.  In the alternative, the Board and its allies argued that the Title III court's $2.4 billion estimation should be affirmed.  Finally, the Board contended that if there were a lien on Net Revenues, it would be avoidable as unperfected.

We consolidated these appeals and ordered expedited briefing and oral argument.[9]

## II.

We begin by asking whether the Trust Agreement grants the Bondholders a lien on any of PREPA's revenues other than those that make it into the Sinking or Subordinate Funds.  We hold that

---

[9]  In our analysis, we frequently refer to arguments made by the Bondholders.  In their briefing, several Bondholders -- specifically, Assured Guaranty Municipal Corp., GoldenTree Asset Management LP, Syncora Guarantee, and U.S. Bank National Association -- incorporate by reference arguments made by other Bondholders, pursuant to Federal Rule of Appellate Procedure 28(i).  The PREPA Ad Hoc Group does not do so.  But neither the Board nor its allies suggests that the Bondholders' invocation of Rule 28(i) was improper, or that the PREPA Ad Hoc Group's failure to invoke Rule 28(i) constitutes waiver of arguments raised exclusively by other Bondholders.  So, where a Bondholder sufficiently develops a given argument, we attribute that argument to all "the Bondholders."

the Trust Agreement grants the Bondholders a lien on PREPA's Net Revenues, even if they are not placed in one of the Funds.  Our reasoning follows.

### A.

### 1.

The dispute about the scope of the Bondholders' lien begins with the Trust Agreement's Preamble.  In pertinent part, the Preamble provides:  "Now, Therefore, This Agreement Witnesseth, that . . . in order to secure the payment of [the Revenue Bonds] . . . [PREPA] does hereby pledge to the Trustee the revenues of the System . . . and other moneys to the extent provided in this Agreement as security for the payment of the [Revenue Bonds] . . . and it is mutually agreed and covenanted . . . as follows . . . ."[10]

---

[10]  The full text of the Preamble reads:

Now, Therefore, This Agreement Witnesseth, that in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the bonds by the holders thereof, and also for and in consideration of the sum of One Dollar to the Authority in hand paid by the Trustee at or before the execution and delivery of this Agreement, the receipt of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the bonds are to be issued, executed, authenticated, delivered, secured and accepted by all persons who shall from time to time be or become holders thereof, and in order to secure the payment of all the bonds at any time issued and outstanding hereunder and the interest and the redemption premium, if any, thereon according to their tenor, purport and effect, and in order to secure the performance and observance of all

According to the Bondholders, the Preamble grants a lien on all of PREPA's "Revenues," which is defined as PREPA's gross revenues with several exceptions not relevant here. In sharp contrast, the Title III court found that the Preamble did not create any lien at all, let alone a lien on PREPA's gross revenues. The court gave two reasons for this conclusion.

First, the court concluded that the Preamble was a non-binding "prefatory clause" -- much like a "whereas clause" -- rather than a "self-effectuating granting clause." The Board does not defend this reading of the Preamble, calling it "beside the point." In its brief, AAFAF actually concedes that the Preamble's language is "operative." Only the Committee and a group of intervenors defend the contention that the Preamble is not

the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the revenues of the System, subject to the pledge of such revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned), and other moneys to the extent provided in this Agreement as security for the payment of the bonds and the interest and the redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds, and it is mutually agreed and covenanted by and between the parties hereto, for the equal and proportionate benefit and security of all and singular the present and future holders of the bonds issued and to be issued under this Agreement, without preference, priority or distinction as to lien or otherwise, except as otherwise hereinafter provided, of any one bond over any other bond, by reason of priority in the issue, sale or negotiation thereof or otherwise, as follows:

operative.  The former labels the clause "not an operative term at all," but rather a "lead-in" or "recital."  And the latter calls the clause "prefatory."

We agree with the Bondholders that the Preamble is a granting clause, rather than a prefatory clause.  To be sure, language that only expresses the aspirations of the parties (such as a classic "whereas" clause) can be a mere table-setter, often without legal force.  See Minturn v. Monrad, 64 F.4th 9, 15 (1st Cir. 2023).  And the Trust Agreement does begin with table-setting "whereas" clauses.  But the relevant Preamble language does not appear in such a clause.  Instead, it debuts in a subsequent "Now Therefore . . ." clause, which states that the Authority "does hereby pledge to the Trustee the revenues of the System . . . and other moneys to the extent provided in this Agreement as security for the payment of the bonds."  (Emphasis added.)  This language reflects a promise, not merely an aspiration or a description of background facts.

Puerto Rico case law supports the conclusion that the Preamble is not merely prefatory.[11]  In a case interpreting an unrelated bond agreement, the Puerto Rico Supreme Court found that a provision beginning with "Now, Therefore" was one of the "main clauses" in the contract.  D'All Concrete Mix, Inc. v. Raúl

---

[11]  Under section 1301 of the Trust Agreement, Puerto Rico law governs the contract's construction.

Fortuño, Inc., 14 P.R. Offic. Trans. 954, 956 (1983) (per curiam).
We see no reason to read the Preamble differently, especially given
that no party identifies any contrary Puerto Rico authority.

Our conclusion that the text of the Preamble is not
merely prefatory brings us to the Title III court's alternative
finding that the Preamble did not create any kind of security
interest because it did not use the words "lien" or "charge."
Again, the Board and its allies do not defend the court's
reasoning.  The Board even concedes that the Preamble's "pledge"
is enough to create a security interest.

The Board is correct.  There is no "magic words"
requirement for creating a security interest under Puerto Rico
law.  Instead, a security agreement need only "indicate an
[objective] intent to create a security interest." In re Esteves
Ortiz, 295 B.R. 158, 162 (B.A.P. 1st Cir. 2003) (applying Puerto
Rico law).  The Preamble clearly evinces such an intent.  It states
that "in order to secure the payment" of the Revenue Bonds, PREPA
"pledge[s] . . . the revenues of the System . . . and other moneys
to the extent provided in this Agreement as security for the
payment of the bonds."  This language closely resembles language
that we have previously found sufficient to create a security
interest.  See, e.g., In re Navigation Tech. Corp., 880 F.2d 1491,
1493 (1st Cir. 1989) (finding that an assignment of contractual

rights "[t]o secure the payment of [a] debt" was enough to create a security interest).

Revealingly, the Authority Act -- which, as the Title III court found, authorizes PREPA to grant liens in its revenues -- uses the same phrasing as the Preamble.  Section 206 of the Authority Act states that PREPA may "pledg[e]" its current or future revenues to "secure payment of [revenue bonds]."  See P.R. Laws Ann. tit. 22, § 206(e)(1).  In other words, the Authority Act expressly contemplates that a "pledge" to "secure payment" of a bond can create a security interest.  It would therefore be paradoxical to hold that the identical language in the Preamble does not create such an interest.

## 2.

Having established that the Preamble creates a security interest, we next determine the scope of that security interest. The Trust Agreement specifies that PREPA pledges as security for the Revenue Bonds "the revenues of the System . . . and other moneys to the extent provided in this Agreement . . . as follows." This text poses two questions.  First, what are the "revenues of the System," given that the Trust Agreement never expressly defines the phrase?  And second, does the phrase "to the extent provided in [the Trust Agreement]" apply to both the pledge of the "revenues of the System" and the pledge of "other moneys," or just to one of those pledges?  We address each question in turn.

**i.**

We begin with the Bondholders' ambitious claim that the "revenues of the System" means PREPA's Revenues (i.e., gross revenues). The Trust Agreement does not define "revenues of the System." It does, however, define "Revenues" to mean "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System [minus a variety of investments and transactions]." It also defines "Net Revenues" to mean "the excess of the Revenues . . . over the Current Expenses." By eschewing the defined terms "Revenues" and "Net Revenues" in favor of the undefined term "revenues of the System," the Preamble's text leaves unclear precisely what is being pledged.

To resolve this ambiguity, we turn to the more fundamental rule that a court should read a contract "as a whole." See 11 Williston on Contracts § 32:5 (4th ed.); see also Entact Serv., LLC v. Rimco, Inc., 526 F. Supp. 2d 213, 221 (D.P.R. 2007) (citing P.R. Laws Ann. tit. 31, § 3475) ("[W]hen interpreting contracts, [a court applying Puerto Rico law] must read contract provisions in relation to one another, giving unclear provisions the meaning which arises from considering all provisions together."). And that rule brings clarity.

When negotiating a contract governing billions of dollars in bonds, the parties understandably agreed to accompany any bond issuance with an opinion of counsel that would confirm

the creditors' rights and responsibilities.    This opinion of
counsel would need to describe the security that PREPA purported
to provide its creditors.    The parties supplied that description
in section 101 of the Trust Agreement.    Under section 101, an
opinion of counsel must state that the Trust Agreement "creates a
legally valid and effective pledge of the Net Revenues . . . and
of the moneys, securities and funds held or set aside under this
Agreement as security for the bonds, subject to the application
thereof to the purposes and on the conditions permitted by this
Agreement . . . ."    (Emphasis added.)    We refer to this language
-- which the parties drafted to direct future counsel on how to
describe the collateral securing the Revenue Bonds in connection
with the issuance and delivery of any such bonds -- as the "Opinion
of Counsel Clause."    And given this agreed-upon description, we
construe the phrase "revenues of the System" in the Preamble to
mean "Net Revenues" (i.e., gross revenues minus Current Expenses)
rather than "Revenues" (i.e., gross revenues).

        The Bondholders retort that other Trust Agreement
provisions -- namely, sections 516(c), 705, and 712 -- suggest
that the lien is on Revenues, not Net Revenues.[12]    These provisions
generally forbid PREPA from granting a lien equal or superior to

---

[12]    The Bondholders also reference section 701's statement
that the "Revenues are hereby pledged to the payment of [the
Revenue Bonds]."    Our analysis applies to that language as well.

the lien "secured hereby <u>upon the Revenues</u>."[13]   (Emphasis added.)

These sections are about lien priority, not lien scope.  And none

of these sections says that the Bondholders' lien is secured by

<u>all</u> the Revenues.  That is, even if a bondholder were to have a

lien on <u>part</u> of the Revenues (for example, the Net Revenues), one

could still describe that lien as "upon the Revenues."  Moreover,

even if the Bondholders' preferred reading were plausible, drive-

by references to "Revenues" must take a back seat to the drafters'

focused description of the collateral in the Opinion of Counsel

Clause.  <u>See</u> <u>Restatement (Second) of Contracts</u> § 203, cmt. e (1981)

("Attention and understanding are likely to be in better focus

when language is specific or exact, and in case of conflict the

specific or exact term is more likely to express the meaning of

the parties with respect to the situation than the general

language.").

        Finally, and most practically, even if the Bondholders'

reading of the Trust Agreement were correct, they would likely end

up in the same place.  As all parties agree, PREPA's Revenues and

Net Revenues are "special revenues" under the Bankruptcy Code (a

term that we define more precisely later).  <u>See</u> <u>infra</u> note 15.

And under the Code, any lien on special revenues is subordinate to

---

        [13]  Sections 516(c) and 705 use this language, while
section 712 describes a lien on the "Revenues of the bonds issued
under and secured by this Agreement."

a utility's reasonable and necessary post-petition operating expenses. See 11 U.S.C. § 928(b); 48 U.S.C. § 2161(a) (incorporating section 928 into PROMESA). Accordingly, as the Bondholders conceded at oral argument, "even a gross revenue pledge becomes a net pledge in [a Title III proceeding]." 5 Norton Bankruptcy Law & Practice § 90:13 (3d ed. 2024).

### ii.

The Board and its allies agree that the Bondholders do not have a lien on PREPA's gross Revenues. But they insist that this is only half the story. They argue that the Bondholders' security interest does not even attach to all Net Revenues. Instead, they claim that it attaches only to those Net Revenues that have flowed into the Sinking Fund and/or the Subordinate Funds. This argument trains on the text of the Preamble, which states in relevant part that PREPA "does hereby pledge to the Trustee the revenues of the System . . . and other moneys to the extent provided in this Agreement . . . as follows." (Emphasis added.)

The Board's reasoning is thus: (1) The Preamble's revenue pledge is only "to the extent provided in [the Trust Agreement] . . . as follows"; (2) section 701 of the Trust Agreement states, in turn, that PREPA's "Revenues are hereby pledged . . . in the manner and to the extent hereinabove particularly specified"; (3) therefore, the Preamble and

- 25 -

section 701 are "bookends" that limit the Bondholders' security interest to the more specific grants that appear between those two contractual provisions; (4) those more specific grants -- in sections 401, 507, and 513 -- only expressly provide for liens in the Sinking and Subordinate Funds; (5) so, the Trust Agreement narrows the Preamble's revenue pledge to those Net Revenues that are actually deposited into the Sinking and Subordinate Funds.

The first step in this argument poses a classic antecedent puzzle.  Recall that in the Preamble, the modifying phrase "to the extent provided in [the Trust Agreement]" immediately follows the pledge of "other moneys."  But the Board's argument assumes that this modifying phrase applies to <u>both</u> of its antecedent phrases: "revenues of the System" and "other moneys."  Put differently, in the Board's view, the Preamble pledges (1) the "revenues of the System . . . to the extent provided in [the Trust Agreement]," and (2) "other moneys to the extent provided in [the Trust Agreement]."  Unsurprisingly, the Bondholders counter that the phrase "to the extent provided in [the Trust Agreement]" modifies only its immediate antecedent: "other moneys."

The parties' respective readings rely on arguably opposing interpretative canons.  On the one hand, "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."

Paroline v. United States, 572 U.S. 434, 447 (2014) (quoting Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920)).  In a prior PROMESA case, we cited Paroline to interpret a similar bond agreement between creditors and Puerto Rico's government employee pension system.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 948 F.3d 457, 467 (1st Cir. 2020) ("Andalusian").  There, the bond agreement defined "Employers' Contributions" as "the contributions . . . made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to [certain statutory sections]."  Id. at 464.  We rejected the argument that the modifying phrase beginning with "which are payable to the System" only applied to its immediate antecedent: "any assets in lieu thereof or derived thereunder." Id. at 467.  Instead, we found that the modifying phrase also naturally referred to "the contributions . . . made by the Employers." Id.  The Board urges us to reach a similar conclusion here: that the "to the extent" phrase applies to both of its antecedents.

On the other hand, there is the canon of the last antecedent.  This canon of statutory interpretation broadly prescribes that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Barnhart v. Thomas, 540 U.S. 20, 26 (2003). If we apply this canon, then the "to the extent" phrase underlined

above only modifies its immediate antecedent: "other moneys." Thus, the Preamble would pledge (1) "the revenues of the System," and (2) "other moneys to the extent provided in [the Trust Agreement]."

Faced with the opposing indications of two interpretative guides, we opt for the interpretation that the drafters sanctioned in the Opinion of Counsel Clause. Notably, that clause both "follows" the Preamble and comes before section 701's command to construe the Trust Agreement's revenue pledge "in the manner and to the extent hereinabove particularly specified." And in describing the security granted by the Trust Agreement to protect bondholders, the clause states in pertinent part that the Trust Agreement establishes a "legally valid and effective pledge of the Net Revenues . . . and of the moneys, securities and funds held or set aside under this Agreement as security for the bonds." (Emphasis added.) This language -- with its two "and[s]" -- draws a clear grammatical distinction between the pledge of the "Net Revenues" and the pledge of the "moneys, securities, and funds held or set aside under this Agreement." That distinction runs directly counter to the Board's contention that the Trust Agreement only pledges Net Revenues to the extent they reside in the Sinking or Subordinate Funds.

In agreeing on how to describe the Revenue Bonds' collateral to potential investors in the Opinion of Counsel Clause,

the parties presumably used words that accurately conveyed their mutual intent.  We are loath to read ambiguous language in the Trust Agreement in a manner suggesting that the Agreement calls for investors to be misled, as would be the case if we were to hold that the Bondholders' collateral was limited to moneys in the Sinking and Subordinate Funds.  See Asociacion de Condominos v. Centro I, Inc., 6 P.R. Offic. Trans. 257, 268 (1977) (contract interpretation should consider practical consequences of a proffered reading).  We also find it very unlikely that an objectively reasonable party to the transaction giving rise to the Revenue Bonds would have expected the source of repayment not to be subject to a lien while in the debtor's hands.

To defend its preferred reading, the Board embraces the Title III court's view that the Trust Agreement cannot create overlapping liens in the Net Revenues and the moneys in the Sinking and Subordinate Funds.  The basic argument here is that if the Bondholders have a lien on all Net Revenues, then the Fund-specific liens outlined in sections 401, 507, and 513 would be superfluous, because the Sinking and Subordinate Funds also contain Net Revenues.  But at least one Subordinate Fund -- the Construction Fund -- also includes bond proceeds, which the parties agree are

not Net Revenues.[14]  So, at least one Fund-specific pledge covers moneys not captured by the pledge of the Net Revenues.

To be sure, that still leaves us construing the text as granting an arguably superfluous lien in (at least) the Sinking Fund.  But such superfluity is hardly unheard of in revenue bond agreements.  See In re Las Vegas Monorail Co., 429 B.R. 317, 325, 333 (Bankr. D. Nev. 2010) (interpreting a contract that granted a lien against net revenues, even though the creditor also held liens in the funds that received those net revenues); cf. Unisys P.R., Inc. v. Ramallo Bros. Printing, 1991 WL 735351 (P.R. Offic. Trans.) (court interpreting contract may consider intent of parties in light of industry practice).  Indeed, in this case, such a belt-and-suspenders approach likely offered valuable assurance to the bondholders.  For example, section 507 of the Trust Agreement states that the Sinking Fund is held by the Trustee, not by PREPA.  By expressly noting that the Sinking Fund is "subject to a lien and charge" in favor of the bondholders, the Trust Agreement eliminates any risk that the transfer of moneys from the PREPA-held Revenue Fund to the Trustee-held Sinking Fund would impair the lien initially placed on those moneys as Net Revenues.  Given this context, the mere fact that our interpretation of the Trust

---

[14]  The parties disagree on whether other categories of moneys -- such as letters of credit and federal subsidies -- also qualify as Net Revenues.  We need not resolve that issue here.

Agreement creates superfluity is not enough to invalidate it.  See
Restatement (Second) of Contracts § 203, cmt. b (1981) ("Even
agreements tailored to particular transactions sometimes include
overlapping or redundant or meaningless provisions.").

The Board also points to section 601 of the Trust
Agreement, which states in pertinent part:  "All moneys received
by [PREPA] under the provisions of this Agreement . . . shall not
be subject to lien or attachment by any creditor of [PREPA]."
According to the Board, this provision means that no lien can
attach to Net Revenues in their liminal, pre-Sinking Fund (or
pre-Subordinate Fund) state.  This argument proves too much.  The
Sinking and Subordinate Funds contain only "moneys received" by
PREPA.  If "moneys received" are not subject to a lien, then
section 601 would cast doubt on every lien created by the Trust
Agreement.  And it would undo the work done by both the Preamble
and the Opinion of Counsel Clause.

The more sensible reading of section 601 is that no
non-bondholder creditor may -- absent the bondholders' consent --
secure a lien on moneys received by PREPA.  This reading aligns
with the Authority Act, which states that "[n]o lien whatsoever
may be placed on the assets of [PREPA] insofar as the Trust
Agreement with the bondholders or agreements with the creditors of
[PREPA] do not allow."  P.R. Laws Ann. tit. 22, § 196(o).  Thus,
the Authority Act distinguishes between agreements with

"bondholders" and agreements with PREPA's other "creditors." Id. And if we apply this distinction to section 601, then that provision's prohibition on "lien or attachment by any creditor of [PREPA]" clearly refers to creditors that are not bondholders. (Emphasis added.)  By contrast, section 601 does not bar bondholders from obtaining a lien on "moneys received" by PREPA. On the contrary, it guarantees that any such lien is presumptively superior to a lien held by a non-bondholder creditor.

In sum, we find that as security for the Revenue Bonds, PREPA pledged the Net Revenues and not just those moneys that made it into the Sinking and Subordinate Funds.

## B.

We have established that the Bondholders have a lien on PREPA's Net Revenues.  But that is not the end of the matter.  The parties disagree on a more fundamental question:  Does the lien on Net Revenues also apply to future Net Revenues, i.e., Net Revenues that PREPA has not yet acquired?  We conclude that the answer is yes.  Our reasoning follows.

## 1.

Commonwealth law determines whether -- and to what extent -- a trustee or bondholder may have a security interest in the assets of a bankrupt borrower.  See Butner v. United States, 440 U.S. 48, 54 & n.9 (1979).  Here, the Authority Act expressly permits PREPA to pledge the "entire gross or net revenues and

present or future income of [PREPA], including the pledging of all or any part thereof to secure payment" of the Revenue Bonds.  P.R. Laws Ann. tit. 22, § 206(e)(1).  Puerto Rico has also adopted the Uniform Commercial Code ("UCC"), which sanctions security interests in "after-acquired collateral," i.e., liens extending to property that the debtor does not possess at the time of the underlying security agreement (also known as "floating liens").  P.R. Laws Ann. tit. 19, § 2234(a); see also U.C.C. § 9-204, cmt. 2 ("[A] security interest arising by virtue of an after-acquired property clause is no less valid than a security interest in collateral in which the debtor has rights at the time value is given.").  And the UCC recognizes that a debtor may convey an "account" as security for a debt.  As relevant here, Puerto Rico's version of the UCC defines "account" as a "right to payment of a monetary obligation, whether or not earned by performance . . . for energy provided or to be provided."  P.R. Laws Ann. tit. 19, § 2212(a)(2) (emphasis added).  In sum, several provisions in Commonwealth law establish that the Bondholders may hold a security interest in yet-to-be-acquired Net Revenues.

Congress has also recognized that a revenue bond can be secured by future income.  Under section 552(a) of the Bankruptcy Code, a lien on after-acquired property does not attach to property acquired after the debtor files for bankruptcy.  See 11 U.S.C. § 552(a).  But section 928 of the Bankruptcy Code makes clear that

a lien on "special revenues" -- like the one at issue here -- continues to attach to revenues acquired post-petition, notwithstanding the general bar in section 552(a).[15]  See 11 U.S.C. § 928(a).  As the legislative history shows, Congress passed section 928 to alleviate the concern that municipalities would use section 552(a) to avoid "long-term pledges of [project-specific] revenues."  See S. Rep. No. 100-506, at 25 (1988) (appended letter providing views of Department of Justice).  Thus, the Bankruptcy Code not only recognizes that a debtor may grant a lien on future revenues -- it also expressly states that such liens continue to attach to revenues acquired after the filing of a bankruptcy petition.

Several courts have also considered the scope of a municipal revenue lien like the one before us.  And all of them have concluded (or at least implied) that a revenue lien can extend to revenues to be acquired at a later date.  See, e.g., In re Jefferson Cnty., 474 B.R. 228, 266 (Bankr. N.D. Ala. 2012) (holding that under Alabama law, a revenue lien is a lien on a "source of revenues," rather than a "possessory lien" on revenues already acquired); In re City of Chester, 655 B.R. 555, 567 (Bankr. E.D.

---

[15]  "Special revenues" include "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used . . . to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems."  11 U.S.C. § 902(2)(A).  The parties agree that PREPA's Net Revenues are "special revenues."

Pa. 2023) (recognizing a lien on revenues "payable or to be received" by the city (emphasis added)); In re Fin. Oversight & Mgmt. Bd. for P.R., 931 F.3d 111, 116 (1st Cir. 2019) (noting in passing dicta that applying section 552(a) to special revenue bonds risks the "termination of creditors' security interests in future special revenues"). We have not discovered -- nor has the Board identified -- any contrary authority.

Thus, Puerto Rico law, the Bankruptcy Code, and prior case law all indicate that the Net Revenues that PREPA acquires in the future will be subject to the pledge of Net Revenues made by PREPA in the Trust Agreement.

**2.**

The Board nevertheless lodges several objections to the conclusion that the Bondholders' lien extends to PREPA's future Net Revenues.

**i.**

The Board argues that under our opinion in Andalusian, a revenue lien cannot extend to future-acquired revenues. But Andalusian is inapposite. That case involved bonds issued by Puerto Rico's Employees Retirement System ("ERS"), which were secured by employer contributions to the ERS's multi-employer pension plan. See 948 F.3d at 462-64.

For two main reasons, this court held that the ERS bondholders' lien on employer contributions did not attach to

post-petition contributions.  First, the court reasoned that the future employer contributions were not "proceeds" within the meaning of Bankruptcy Code section 552(b)(1) because their receipt depended on intervening appropriation by the Puerto Rico legislature.[16]  Id. at 467–70.  So, ERS had a "mere expectancy" of receiving future employer contributions, not a conveyable right of receipt that could support a section 552(b)(1) claim on the post-petition proceeds of that pre-petition collateral.  Id. at 468 & n.8.  Second, the court found that employer contributions to ERS were not special revenues within the meaning of section 928(a).  Id. at 463, 473.  Therefore, the ERS bondholders could not rely on that section to avoid section 552(a)'s general rule that pre-petition floating liens are ineffective as to collateral acquired post-petition.

Here, though, there is no claim that PREPA's Net Revenues are proceeds of the Bondholders' pre-petition collateral.  And the Bondholders do not seek the protection of section 552(b)(1) for such proceeds.  Additionally, the parties agree that PREPA's Net Revenues -- unlike the contributions at issue in Andalusian -- are

---

[16]  Broadly, under section 552(b)(1), a creditor maintains a post-petition lien on the "proceeds" of collateral acquired pre-petition.  11 U.S.C. § 552(b)(1).  The bondholders in Andalusian argued that post-petition employer contributions were "proceeds" of collateral they had acquired pre-petition (i.e., ERS's right to receive employer contributions).  See 948 F.3d at 466.

special revenues within the meaning of section 928(a). So, the
Board is effectively arguing that if PREPA's future Net Revenues
are too uncertain to qualify as protected "proceeds" under
section 552(b)(1), then they are also too uncertain to qualify as
protected "special revenues" under section 928. But <u>Andalusian</u>
never linked sections 552(b) and 928 in this way.[17] Indeed, if it
had, then there would have been no need to subsequently find that
the post-petition ERS contributions were not protected special
revenues under section 928. <u>See id.</u> at 473–75. The finding that
the contributions were too uncertain to fall within section 552(b)
would have sufficed. We will not read <u>Andalusian</u> in a manner that
renders the entire second half of the opinion superfluous dicta.

**ii.**

The Board next argues that recognizing any interest in
future PREPA Net Revenues is contrary the Commonwealth's adoption
of Article 9 of the UCC. The Board contends that a security
interest cannot attach to property under the UCC until (1) the
property exists; and (2) the debtor has a transferable right in
that property. As a general proposition, this is true. <u>See</u> P.R.

---

[17] As a side note, the Board's implicit assumption that
future rate payments to PREPA are as uncertain as the future ERS
contributions in <u>Andalusian</u> is somewhat dubious. Unlike the
contributions in <u>Andalusian</u>, PREPA's right to collect rate
payments does not depend on intervening legislative appropriation.
<u>See</u> P.R. Laws tit. 22, § 196(l). Importantly, though, we do not
rely on this fact in concluding that <u>Andalusian</u> does not control
here.

Laws Ann. tit. 19, § 2233(a) (a security interest attaches when it becomes enforceable); id. § 2233(b) (a security interest is enforceable when, among other things, "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party").

However, the Board's argument proves only that a creditor cannot enforce a floating lien with respect to specific units of yet-to-be-acquired collateral. See U.C.C. § 9-204, cmt. 2 (validating a "floating lien" in a debtor's "existing and (upon acquisition) future assets" (emphasis added)). For example, the floating lien does not permit Bondholders to demand now Net Revenues that the debtor will receive in five years. But this does not mean that PREPA cannot convey an initial overarching interest in any Net Revenues that come through the door in five years. In other words, the Board's objection goes to when a revenue lien attaches to (and is perfected with respect to) future Net Revenues. It does not undermine our initial conclusion that, under Commonwealth law, a debtor may convey a lien on future Net Revenues. See P.R. Laws Ann. tit. 19, § 2234(a); P.R. Laws Ann. tit. 22, § 206(e)(1).

**3.**

We also address an argument raised by the Title III court, rather than the Board. In its opinion below, the court agreed with us that PREPA could grant a lien that would attach to

its future-acquired revenues, but it found "no evidence" that PREPA had actually done so.  However, as we discuss in more depth below, see infra Part III.A, the Bondholders' lien in the Net Revenues is best understood as a security interest in an "account" under Article 9 of the UCC.  And it is "commercially reasonable to anticipate that security interests in inventory or accounts would include after-acquired property."  Am. Empls. Ins. Co. v. Am. Sec. Bank., N.A., 747 F.2d 1493, 1501 (D.C. Cir. 1984) (quoting In re Middle Atl. Stud Welding Co., 503 F.2d 1133, 1137 (3d Cir. 1974) (Seitz, C.J., dissenting)).  So, the fact that PREPA granted a lien in an account (i.e., the right to receive Net Revenues), and did so without reservation, is enough to conclude that the lien extended to after-acquired Net Revenues.  Indeed, it strains plausibility to suggest that the parties agreed otherwise, i.e., that bondholders paid billions in return for a pledge of Net Revenues that applied only to Net Revenues received or due on the day the Trust Agreement was executed.  See Asociacion de Condominos, 6 P.R. Offic. Trans. at 268 (considering practical consequences of proposed contractual interpretation).

## III.

As an alternative basis for affirming, the Board argues that even if the Bondholders have a lien on PREPA's current and future Net Revenues, that lien is avoidable under 11 U.S.C. § 544(a).  Section 544(a) grants the bankruptcy trustee (or, in a

PROMESA case, the Board) the powers of a hypothetical creditor who "extends credit . . . at the [beginning] of the case," and thereby obtains "a [judgment] lien on all property on which a creditor on a simple contract could have obtained such a [judgment] lien." See 11 U.S.C. § 544(a); 48 U.S.C. § 2161(c)(7).

In Puerto Rico, a judgment lien is superior to any unperfected security interest. See P.R. Laws Ann. tit. 19, § 2267. So, if the Net Revenue lien is unperfected, then the Board may avoid it. The Title III court did not address whether the Net Revenue lien was perfected because it concluded that no such lien existed. Having established that the Net Revenue lien exists, and with the benefit of full argument and briefing, we conclude that it is perfected with respect to Net Revenues that PREPA has acquired. We also conclude that the lien's application to future Net Revenues will be perfected, at the very latest, immediately upon PREPA's acquisition of those Net Revenues. This means no hypothetical judgment creditor can outrank the Bondholders with respect to those future-acquired Net Revenues. So, the Board's avoidance argument fails.

**A.**

We first find that the Bondholders have perfected their lien with respect to Net Revenues already acquired by PREPA. Under Article 9 of the UCC (as adopted in Puerto Rico), the mechanism for perfecting a lien depends on the underlying collateral. See

id. §§ 2251–64.  Thus, the first step in the perfection analysis
is to categorize the Bondholders' collateral.  The Bondholders
mainly argue that their security interest is in an "account," as
that term is defined in the UCC.  The Board retorts that the
Bondholders' interest is in either "money" or "deposit accounts,"
as those terms are defined in the UCC.  The Bondholders have it
right.

As discussed above, Puerto Rico defines an "account" as
a "right to payment of a monetary obligation . . . for energy
provided or to be provided."  Id. § 2212(a)(2)(v).  This squarely
describes the Net Revenue lien.[18]  The Bondholders loaned PREPA
money, and they are secured by the Net Revenues that PREPA obtains
(or will obtain) by providing electricity.  By contrast, neither
of the categories proposed by the Board appear to fit.  A deposit
account is a "demand, time, savings, passbook, or similar account
maintained with a bank."  Id. at § 2212(a)(29).  This may describe
the Sinking and Subordinate Funds, but it does not describe the
underlying Net Revenues that feed those Funds.

Commonwealth law defines the term "money" generally, but
not as a category of collateral.  See id. § 451(24) (defining money

---

[18]  We are not alone in describing a lien on revenues as an
"account" under the UCC. See, e.g., In re Northview Corp., 130
B.R. 543, 544–45, 547 (B.A.P. 9th Cir. 1991) (pledge of
"all . . . revenues . . . now or hereafter acquired" by a hotel
was an account under the UCC); In re Ocean Place Dev., LLC, 447
B.R. 726, 732 (Bankr. D.N.J. 2011) (same).

as a "medium of exchange authorized or adopted" by a government).
However, the latest version of Article 9 of the UCC defines "money"
as hard currency.  See U.C.C. § 9-102(a)(54A) (noting that "money"
does not include electronic currency not subject to physical
control).  No party alleges that PREPA is holding its Net Revenues
as currency.  So, the "money" category also seems inappropriate.

In Puerto Rico, an interest in an "account" is perfected
by filing a financing statement.  P.R. Laws Ann. tit. 19,
§ 2260(a).  A financing statement is valid for at least five years.
See id. § 2335(a); see also id. § 2335(f) (financing statement
lasts indefinitely where debtor is a "transmitting utility and a
filed financing statement so indicates").  Here, the Bondholders
filed an updated financing statement in August 2013, which
described the underlying collateral as the "Revenues of the System
(as each such term is defined in the Agreement) and other moneys
to the extent provided in the Agreement."[19]  The Board filed its
restructuring petition for PREPA in July 2017, so the August 2013

---

[19] The language of the financing statement seems to imply
that the Bondholders' lien is in Revenues, rather than Net
Revenues.  But under Commonwealth law, the financing statement
cannot create an interest beyond that created by the Trust
Agreement.  See Xynergy Healthcare Cap. II LLC v. Municipality of
San Juan, 516 F. Supp. 3d 137, 155-56 (D.P.R. 2021) (quoting In re
Levitz Ins. Agency, 152 B.R. 693, 698 (Bankr. D. Mass. 1992))
("Where a security agreement covers only certain assets, the
financing statement's inclusion of additional assets is
ineffective to create a security interest in the additional assets
omitted from the security agreement.").

financing statement was timely.  Moreover, the Board does not argue that the August 2013 financing statement insufficiently described the Bondholders' collateral, or suffered from any other flaw that would render the Net Revenue lien unperfected.

Accordingly, the Bondholders have clearly perfected their lien with respect to Net Revenues that PREPA has already acquired.  See P.R. Laws Ann. tit. 19, § 2233(b) (security interest attaches once "debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"); id. § 2258 (perfection requires attachment).

**B.**

The next question is whether and how the Bondholders have perfected their lien on Net Revenues that PREPA has not yet acquired.  Here, some background on the law and commentary on this issue is instructive.

Under 11 U.S.C. § 547(b), a bankruptcy trustee may avoid a debtor's pre-petition transfer of property to a creditor, if such transfer: (1) was made for an antecedent debt; (2) was made while the debtor was insolvent; (3) was made within a certain time period (usually ninety days); and (4) gives the creditor more than it would receive in a liquidation scenario that did not include the transfer.  See also 5 Collier on Bankruptcy ¶ 547.01 (16th ed. 2023) (providing an overview of section 547).  Before 1978, a body of case law emerged to reconcile section 547's language on

pre-petition transfers with the UCC's recognition of liens on after-acquired property. See, e.g., 4 White, Summers & Hillman, Uniform Commercial Code § 32:24 nn. 2-5 (6th ed. 2023) (collecting authorities). To understand the problem, consider a simplified example of a creditor with a lien on a merchant's revolving inventory (i.e., a lien on after-acquired property). If we conceive of the creditor as holding a distinct lien on each unit of inventory, which arises only as the inventory is acquired, then -- all else being equal -- any liens on inventory acquired in the ninety-day pre-petition period would arguably be avoidable as preferences under section 547. The upshot is that the creditor would have no bulletproof lien on inventory acquired even months before the bankruptcy petition date.

To avoid this outcome, several courts proposed the "entity" or "stream" conception of liens on after-acquired property. See, e.g., Grain Merchs. of Ind., Inc. v. Union Bank & Sav. Co., 408 F.2d 209, 215-17 (7th Cir. 1969); DuBay v. Williams, 417 F.2d 1277, 1287 n.8 (9th Cir. 1969) (describing the idea in dicta without adopting it); Manchester Nat'l Bank v. Roche, 186 F.2d 827, 831 (1st Cir. 1951) (same). On this view, the creditor's security interest was not in each individual piece of inventory. Instead, the interest was in the "entity of [inventory] as a whole, and not in the individual components, so that the [relevant] transfer of property occurred" when the "interest in the

[inventory] as an entity was created and the financing statements were duly filed," rather than when the debtor acquired rights in a particular piece of inventory.  Grain Merchs., 408 F.2d at 216. One commentator put it in more philosophical terms, suggesting that "[t]he secured creditor's interest is in the stream of accounts flowing through the debtor's business, not in any specific accounts.  As with the Heraclitean river, although the accounts in the stream constantly change, we can say it is the same stream." William E. Hogan, Games Lawyers Play with the Bankruptcy Preference Challenge to Accounts and Inventory Financing, 53 Cornell L. Rev. 553, 560 (1968).

Congress amended the Bankruptcy Code in 1978 to overrule Grain Merchants, noting that for preference purposes, the relevant transfer only occurred when "the debtor has acquired rights in the property transferred."  11 U.S.C. § 547(e)(3); see also S. Rep. No. 95-989, at 89 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5875 (expressing intent to overrule Grain Merchants).  In its briefing, the Board implies that by adopting what would become section 547(e)(3), Congress expressly "disapprov[ed] of the 'stream' [conception]" of after-acquired property that the pre-1978 cases espoused, and which the Bondholders seem to endorse.

Just a decade later, though, Congress executed a u-turn by adding section 926(b) to the Bankruptcy Code.  Under that provision, a transfer of property "for the benefit of any holder

of a bond or note" is not avoidable under section 547. 11 U.S.C.
§ 926(b).  So, at least with respect to revenue bond payments,
Congress appeared to resurrect the pre-1978 "stream" or "entity"
theory of after-acquired property.  And the legislative history
suggests as much.  To quote the accompanying Senate committee
report: "[I]n the municipal finance context, if the lien on future
revenues is voided as a preference, the result is at odds with
public policy and state enabling legislation which almost
invariably provides that pledges of such revenues are effective
when made and good against other creditors." S. Rep. No. 100-506,
at 7 (1988) (emphasis added).

　　　The "stream" or "entity" theory discussed in Grain
Merchants -- and reiterated in the legislative history of
section 926(b) -- resembles the theory that the Bondholders
advance now.  In essence, the Bondholders argue that their lien
covers the "stream" of Net Revenues as a whole, not the individual
batches of Net Revenues as they come in the door.  Thus, the
Bondholders argue that by virtue of their perfected lien in the
"stream" of Net Revenues, they currently hold perfected interests
in both already-acquired and future-acquired Net Revenues.

　　　Puerto Rico has not expressly adopted a "stream" theory
of after-acquired collateral.  Nor is there any Commonwealth case
that applies the reasoning from Grain Merchants (or Congress's
adoption of section 926(b)) to revenue bonds.  We therefore

hesitate to endorse the Bondholders' sweeping assertion that -- under Commonwealth law -- their perfected lien on the Net Revenue "stream" means they hold an already-perfected interest in future-acquired Net Revenues.

Moreover, even if we were to assume that Commonwealth law recognizes the "stream" theory in some form, it does not follow that the Bondholders currently have a perfected lien on all not-yet-acquired Net Revenues. Indeed, some commentators read Grain Merchants as holding that lien attachment (and therefore the potential for perfection) still only arises when the debtor acquires the collateral. On this view, when a creditor holds a lien in a collateral "stream," the creditor does not automatically hold a perfected interest in each piece of collateral within that "stream." Instead, the creditor's interest in a piece of collateral attaches upon acquisition and is treated as if perfected at the time of the initial financing statement. See, e.g., Rafael I. Pardo, On Proof of Preferential Effect, 55 Ala. L. Rev. 281, 305 (2004) ("[T]he [Grain Merchants] lien creditor test related the timing of the transfer of a security interest acquired under a floating lien back to the filing of a financing statement by the secured party."); Richard F. Duncan, Preferential Transfers, the Floating Lien, and Section 547(c)(5) of the Bankruptcy Reform Act of 1978, 36 Ark. L. Rev. 1, 7 n.29 (1982) (noting that a security interest in after-acquired collateral would be perfected "under

the earlier filing"). This slightly modified approach to the "stream" theory finds some footing in Commonwealth law. As noted above, under Commonwealth law, a lien attaches to property upon acquisition. P.R. Laws Ann. tit. 19, § 2233(b); see also U.C.C. § 9-204, cmt. 2. It therefore seems to follow that the Bondholders cannot currently hold a perfected lien in property that PREPA has not yet acquired.

Ultimately, we need not identify the precise contours of the Commonwealth law governing attachment and perfection. Under any plausible conception of Commonwealth law, the Bondholders' lien on future-acquired Net Revenues is not avoidable. If the Commonwealth adopts the Bondholders' sweeping view -- i.e., that their perfection of the lien in the Net Revenue "stream" means they already hold a perfected interest in future-acquired Net Revenues -- then the lien is clearly unavoidable. If the Commonwealth adopts the modified conception of "stream" theory discussed above, then the Bondholders' lien will attach to future Net Revenues when PREPA acquires them, at which point the lien will be treated as if it was perfected at the time of the initial financing statement. And if the Commonwealth adopts no "stream" theory at all, then perfection would occur as soon as PREPA acquires any future Net Revenues. See P.R. Laws Ann. tit. 18, § 2258 ("A security interest is perfected when it attaches if the applicable requirements are satisfied before the security interest

attaches.").  In that case, there would be no intervening period during which a judgment creditor could obtain a superior lien. Cf. Arthur J. Harrington, Insecurity for Secured Creditors: The Floating Lien and Section 547 of the Bankruptcy Act, 63 Marq. L. Rev. 447, 467 n.75 (1980) ("Since attachment is immediate, there is simply no intervening time between the debtor's acquisition of the collateral and perfection of the secured party's rights . . . during which the [judgment] creditor's right can attach to the debtor's inventory and accounts receivable.").  Thus, section 544(a) would not apply.

Accordingly, we hold that the Bondholders' lien is not avoidable under section 544(a).[20]

**IV.**

We have held that the lien granted by the Trust Agreement covers PREPA's present and future Net Revenues, and that the Bondholders' lien is not avoidable.  This leaves unanswered the following question:  How should the Title III court account for that lien in PREPA's restructuring?  Some of the Bondholders ask us to the answer that question now.  We decline to do so.

---

[20]  As noted earlier, see supra note 8, the Bondholders have reserved the right to argue that perfection of the lien on Net Revenues also perfects the liens on moneys deposited into certain Funds.  Because the district court had no opportunity to rule on this issue, and because we have not received focused briefing on it, we offer no opinion on whether -- or to what extent -- perfection of the Net Revenue lien influences perfection of the liens in the Sinking and/or Subordinate Funds.

Without focused briefing from the parties or insight from the Title III court, it is difficult to determine precisely what must be decided. The Title III court never discussed how to account for a Net Revenue lien during PREPA's restructuring. It had no occasion to do so, because it held that no lien in the Net Revenues existed. Instead, the court answered the materially different question of how to account for a lien that covered only moneys in the Sinking and Subordinate Funds.

In their briefing, some Bondholders point to the Title III court's suggestion that a plan of adjustment will "cut[] off accretions of the [Bondholders'] security interest." They argue that this language amounts (incorrectly, they say) to a holding that a plan of adjustment can unilaterally "cut off" the Bondholders' security interest, no matter what form that interest takes. But the court's language only applied to a lien on the Sinking and Subordinate Funds. Basically, the court held that a plan of adjustment would discharge PREPA's contractual obligation to replenish the Sinking and Subordinate Funds. Therefore, any "accretions" to those Funds would stop on the confirmation date, meaning the Bondholders' security interests in those Funds would not grow in value after the confirmation date. That holding says nothing about the extent to which a lien on Net Revenues received post-confirmation is dischargeable in a plan of adjustment.

We therefore decline to tell the Title III court -- in the first instance and without adequate briefing -- how it should deal with the Bondholders' Net Revenue lien during plan confirmation.  In working through the difficult, novel, and important questions posed by the Title III proceedings in this case and others, we have found the considered opinions and insights of the Title III court to be extremely helpful.  This has been true even in the handful of cases (like this one) where we have, with the benefit of time and further briefing, arrived at a different outcome.

## V.

Next, the parties ask us to consider two disputes regarding related questions that the Title III court did address: (1) What is the size of the claim that the Net Revenue lien secures?; and (2) If the Bondholders' collateral only satisfies part of that claim, may the Bondholders file a deficiency claim for the remainder?

## A.

We start with the first question:  What is the amount of the Bondholders' claim on PREPA's estate?  We conclude that the proper amount of the Bondholders' claim is the face value (i.e., principal plus matured interest) of the Revenue Bonds.

**1.**

We begin by summarizing the Title III court's holding on this question.  In the proceedings below, the court concluded that the Bondholders only had a secured claim on moneys deposited into the Sinking and Subordinate Funds.  As our preceding discussion makes clear, we do not share this view.  But the Title III court also found that the Bondholders had an unsecured claim on PREPA's Net Revenues, even if they were not yet deposited in the Sinking and Subordinate Funds.

To understand the Title III court's finding, we must look to section 101(5) of the Bankruptcy Code.  Under that section, a creditor can have two types of claim on a bankrupt debtor's estate.  First, a creditor's claim can stem from a "right to payment."  11 U.S.C. § 101(5)(A).  Second, a creditor's claim can stem from a "right to an equitable remedy for breach of performance[,] if such breach gives rise to a right to payment." Id. § 101(5)(B).

The Title III court found that the Bondholders' unsecured claim on Net Revenues derived from a "right to an equitable remedy for breach of performance."  Id.  Recall the remedies outlined in the Trust Agreement.  If PREPA breached its contractual covenant to transfer Net Revenues into the Sinking and Subordinate Funds, then the Bondholders could force PREPA to change course by placing PREPA into receivership, or by seeking specific

performance.  Those are equitable remedies.  And those remedies would, by definition, reach Net Revenues not yet deposited into the Sinking and Subordinate Funds.  Therefore, the court found, the Bondholders had a claim on the Net Revenues that derived from their "equitable remed[ies] for breach of performance." Id.  And the amount of that claim was limited to "[what] could be achieved through the application of the equitable remedies to fulfill the . . . covenant to pay the [Revenue] Bonds from the Net Revenues of the System."

That brings us to section 502(c)(2) of the Bankruptcy Code.  Under that section, a court may estimate (i.e., assign a dollar amount to) a "right to payment arising from a right to an equitable remedy for breach of performance." See id. § 502(c)(2). Applying section 502(c), the district court estimated the Bondholders' unsecured claim on the Net Revenues at $2.4 billion. Broadly speaking, the Title III court reached that number by estimating how much Net Revenue a receiver would be able to direct into the Sinking and Subordinate Funds (while complying with the rest of the Trust Agreement) over the next 100 years, and then discounting that figure to present value.

### 2.

We disagree with the foundational assumption of the Title III court's valuation analysis: that the Bondholders' claim on the Net Revenues was a "right to payment arising from a right

to an equitable remedy for breach of performance" subject to estimation under section 502(c)(2).  Instead, we find that the Bondholders had a legal "right to payment" rooted in the covenants outlined in the Trust Agreement.  Because the Revenue Bonds specify the amount that PREPA legally owes the Bondholders, there was no need to estimate the Bondholders' "right to payment" under section 502(c).

A creditor holds a "right to payment" when the debtor is legally obligated to pay "under the relevant non-bankruptcy law." In re Chateaugay Corp., 53 F.3d 478, 497 (2d Cir. 1995) (quoting In re Nat'l Gypsum Co., 139 B.R. 397, 405 (Bankr. N.D. Tex. 1992)). Here, that non-bankruptcy law is the law of contracts (and the Authority Act) as applied to the Trust Agreement.  And the Trust Agreement clearly requires PREPA to pay the bonds in full.  In section 701 of the Trust Agreement, PREPA promises to "promptly pay the principal of and interest on each and every bond issued" under the Trust Agreement.  This covenant creates a legal right to payment.  To be sure, but for the automatic stay on actions against PREPA's estate, the Bondholders could deploy various equitable remedies -- such as receivership -- to enforce their right to payment if PREPA breaches the covenant.  See P.R. Laws Ann. tit. 22, § 208.  But the underlying right remains a legal one. Indeed, the Trust Agreement expressly permits the Bondholders to

proceed at law to challenge any breach of the Trust Agreement's covenants.

When a legal right to payment arises from a debt instrument, the "proper amount of claim in a bankruptcy case" is the "full face amount of [the instrument]." In re Oakwood Homes Corp., 449 F.3d 588, 596-97 (3d Cir. 2006) (emphasis omitted) (quoting 4 Collier on Bankruptcy ¶ 502.03 (5th rev. ed. 2005)); see also In re Trendsetter HR L.L.C., 949 F.3d 905, 910 n.22 (5th Cir. 2020) (citing the same Collier section).

This makes sense. As an analogy, consider how courts have applied section 502(c)(1), another estimation provision that applies to "contingent or unliquidated claim[s]." 11 U.S.C. § 502(c)(1). The purpose of that provision is to assign a dollar amount to "undetermined claims of an unsettled amount." In re Trendsetter, 949 F.3d at 910 n.22. By contrast, section 502(c)(1) does not apply to "liquidated claims" -- that is, claims with an amount determinable "by reference to an agreement or by a simple computation." In re Nicholes, 184 B.R. 82, 89 (B.A.P. 9th Cir. 1995). When dealing with "liquidated claims," the court can often look to an underlying agreement to determine the claim amount. Id. ("[D]ebts arising from a contract are generally liquidated."); see also In re Flaherty, 10 B.R. 118, 120 (Bankr. N.D. Ill. 1981) (the amount of a liquidated claim "may be ascertained by computation or reference to the contract out of which the claim

arises"); 2 <u>Norton Bankruptcy Law & Practice</u> § 48:13 (3d ed. 2024)
("Liquidated claims . . . should be calculated directly from the
underlying obligation under applicable law.").

The case law around section 502(c)(1) informs our
analysis of section 502(c)(2). A claim "arising from a right to
an equitable remedy for breach of performance" resembles a
"contingent or unliquidated claim." In both cases, the amount of
the claim is not easy to discern, so estimation is appropriate.
11 U.S.C. § 502(c)(1)–(2). But here, the Bondholders' claim
resembles a "liquidated claim." We can easily determine its amount
by looking to the contract from which it arises: the Trust
Agreement. <u>In re Flaherty</u>, 10 B.R. at 120. According to that
contract, the face value of the Revenue Bonds (i.e., the principal
plus matured interest) is just under $8.5 billion.[21] So, that is
the amount of the Bondholder's claim on the Net Revenues.

Only one party -- AAFAF -- attempts to defend the
Title III court's estimation analysis. The agency argues that the
Bondholders do not have a contractual right to payment in full,
because section 804 of the Trust Agreement permits paying the
Bondholders "solely from the Sinking Fund and other moneys
available for such purpose." So, AAFAF argues, the Bondholders

---

[21]  For our purposes, the face value of a debt instrument is
the principal plus any matured interest. The bankruptcy court
must disallow any portion of a claim attributable to unmatured
interest. <u>See</u> 11 U.S.C. § 502(b)(2).

only have a right to payment from non-deposited Net Revenues if
they deploy their equitable remedies to force those Net Revenues
into the Sinking Fund. The upshot of this argument is that any
right to payment from the Net Revenues is equitable, not legal.

There are two problems with this argument. First, AAFAF
conflates the mechanism by which the Bondholders are paid with the
Bondholders' underlying legal right to payment. The fact that
payments come from the Sinking Fund says nothing about the
Bondholders' underlying entitlement to those payments in the first
place. That legal right stems from the payment covenant in
section 701, which never states that the Bondholders are only
entitled to payment from the Sinking Fund. Second, the text of
section 804 undercuts AAFAF's position. That provision permits
payment of the Bondholders from the "Sinking Fund and any other
moneys available for such purpose." (Emphasis added.) Net
Revenues are "available" for debt service. The only pre-debt
service payments required by the Trust Agreement are the deduction
of Current Expenses from incoming Revenues, which is required under
section 505. After that, Net Revenues are eligible for debt
payments, as evidenced by the text of section 804 referring to
"other moneys" available for debt service, not "other funds"
available for debt service.

Accordingly, the proper amount of the claim is the
principal plus matured interest of the bonds, or roughly

$8.5 billion (the district court can determine the precise amount). Importantly, this is not to say that the Bondholders must be paid $8.5 billion. Rather, it is to say that the Bondholders' allowed claim on PREPA's estate is on the order of $8.5 billion. And that allowed claim is only secured "to the extent of the value of [the Bondholders'] interest" in the Net Revenues and the Sinking and Subordinate Funds. 11 U.S.C. § 506(a)(1). If the value of those liens is less than the allowed claim amount, then the Bondholders are undersecured. In that event, what (if anything) can the Bondholders do to recover the difference between the allowed claim amount and the value of their collateral? We turn to that question next.

**B.**

In the proceedings below, the parties took opposing positions on whether the Bondholders had any recourse against PREPA beyond their rights to the collateral securing the Revenue Bonds. Given our holding that the Bondholders' collateral does include PREPA's Net Revenues, the significance of this issue has likely shrunk, but not disappeared.

Under section 1111(b) of the Bankruptcy Code, a secured creditor -- subject to limited exceptions -- has "recourse against the debtor on account of [its secured] claim," even if the creditor is otherwise nonrecourse under applicable non-bankruptcy law. Id. § 1111(b)(1)(A). However, under section 927 of the Bankruptcy

Code, this presumption of recourse does not apply to a "holder of a claim payable solely from special revenues of the debtor." Id. § 927.

The Bondholders contend that section 927 does not apply, because their secured claim is not payable "solely" from special revenues. Instead, they claim, the Revenue Bonds are also payable from non-special revenue sources like investment earnings, federal subsidies, or insurance proceeds. This argument overreads the word "solely" in section 927. The purpose of section 927 is to deny special revenue bondholders any recourse to the general funds of a municipality, which are often subject to "statutory or constitutional limits on debt issuance." 6 Collier on Bankruptcy ¶ 927.02 (16th ed. 2024). Thus, a claim is payable "solely from special revenues" under section 927 when the claimant lacks "any right to claim from the general treasury of the municipality." Id. Here, the Trust Agreement expressly states that the Revenue Bonds are not "general obligations of [the] Commonwealth of Puerto Rico." So, section 927 applies, and the Bondholders' recourse is limited to their collateral unless the Trust Agreement says otherwise.

Nothing in the Trust Agreement makes the Bondholders recourse creditors. The only contractual provisions cited by the Bondholders are sections 804 and 805. Section 804 permits the Bondholders' Trustee to sue PREPA for unpaid moneys, and to demand

payment from the "Sinking Fund and any other moneys available for
[debt service]."  As noted above, only the Net Revenues (and the
non-Net Revenue moneys in the liened Funds) are available for debt
service.  Section 505 of the Trust Agreement requires payment of
Current Expenses (i.e., conversion of Revenues to Net Revenues)
before any payments may flow to the Bondholders.  So, section 804
simply states that the Bondholders may reach the Net Revenues and
the liened Funds to recover unmade payments.  It does not grant
any further recourse.  The same logic applies to section 805, which
states that if moneys in the Sinking Fund are insufficient to make
debt service payments, the Bondholders may reach the moneys in the
Sinking Fund and "any moneys then available or thereafter becoming
available for [debt service]."  Again, only Net Revenues and the
liened Funds are available for debt service.  So again, section 805
does not broaden the Bondholders' recourse beyond their
collateral.

Thus, the Bondholders are nonrecourse creditors.  A
nonrecourse creditor may "look only to its collateral for
satisfaction of its debt and does not have any right to seek
payment of any deficiency from a debtor's other assets."  In re
680 Fifth Ave. Assocs., 156 B.R. 726, 732-33 (Bankr. S.D.N.Y.
1993).  The Bondholders may not file an unsecured deficiency claim
against PREPA, because that claim would naturally reach assets
other than the Bondholders' collateral.  This conclusion is hardly

novel.  In fact, it aligns with the standard market practice for special revenue bonds.  See 4 Norton Bankruptcy Law & Practice § 90:13 (3d ed. 2024) ("[S]pecial revenue bonds usually are non-recourse debt . . . . [I]n the event of default the bondholders have no claim against the municipality's general fund or other non-pledged revenues or assets . . . . [B]ondholders assume the risk that the revenues will not be enough to pay the bonds.").

## VI.

Finally, the Bondholders appeal two related holdings by the Title III court pertaining to PREPA's trust obligations (or lack thereof).  First, some of the Bondholders challenge the court's dismissal of their breach of trust claim.  Second, they challenge the court's dismissal of their "accounting" claim, which is rooted in the Authority Act's command that PREPA "account as if [it] were the trustee of an express trust" in favor of the Bondholders.  P.R. Laws Ann. tit. 22, § 208(a)(2).

We affirm the dismissal of the breach of trust claim, but we reverse the dismissal of the accounting claim.

### A.

Some of the Bondholders claim that when PREPA received Revenues, it held them in trust for the benefit of the Bondholders.  But the Trust Agreement clearly identifies First National City Bank and its successors -- not PREPA -- as Trustee.  In response,

the Bondholders point to language in section 601 stating, in pertinent part, that all moneys received by PREPA "shall be deposited with a Depositary or Depositaries [and] shall be held in trust."  But nothing in section 601 states that PREPA receives and holds its moneys in trust in the first instance.  On the contrary, section 601 -- which is captioned "Deposits constitute trust funds" -- states that "[a]ll moneys deposited with each Depositary, including the Trustee, shall be credited to the particular fund or account to which such moneys belong."  (Emphasis added.)  This language shows that the "Trustee" must be a "Depositary," i.e., a financial institution designated to hold deposits under the Trust Agreement.  PREPA is not a Depositary.  So, we read section 601 as requiring PREPA to deposit moneys with Depositories, who then hold the moneys in trust and apply them in accordance with the Trust Agreement.  Section 601 does not make PREPA itself a trustee.

The text of the Authority Act elsewhere reinforces our conclusion.  The Authority Act requires PREPA to "account as if [it] were the trustee of an express trust."  P.R. Laws Ann. tit. 22, § 208(a)(2) (emphasis added).  As the Title III court properly noted, this language would be unnecessary if PREPA were already a trustee with respect to all moneys received.

## B.

The Bondholders also appeal the Title III court's dismissal of their accounting claim.  Here, the Bondholders are on

firmer footing.  We agree that the accounting claim should be reinstated.

The Authority Act permits the Bondholders, subject to the terms of the Trust Agreement, to bring an equitable action requiring PREPA to "account as if [it] were the trustee of an express trust."  P.R. Laws Ann. tit. 22, § 208(a)(2).  And the Trust Agreement does not limit this authority.  Section 804 permits the Trustee to sue (on the Bondholders' behalf) for "the enforcement of any proper legal or equitable remedy."

The concept of an "accounting" is not defined in the Trust Agreement, the Authority Act, or Puerto Rico law.  Historically, though, an "accounting" has been an equitable remedy much like restitution or disgorgement.  See Liu v. SEC, 591 U.S. 71, 79 (2020) (noting that an equitable cause of action to "depriv[e] wrongdoers of their net profits from unlawful activity" has been variously called accounting, restitution, or disgorgement).

Taken together, the Trust Agreement and Authority Act appear to permit the Bondholders to bring an equitable action for Net Revenues wrongly diverted from debt service.  Indeed, in their brief, the Bondholders suggest that PREPA has spent Net Revenues on unreasonable Current Expenses, thereby starving the Sinking and Subordinate Funds of cash and slowing debt payments to the

Bondholders.  So, the Bondholders appear to have an accounting claim, unless any relevant authorities suggest otherwise.

In dismissing the accounting claim, the Title III court concluded that a creditor requesting an "accounting" under Puerto Rico law is entitled only to information about the debtor's unpaid obligations.  It relied on two authorities for this proposition, but we do not find either one apposite.

First, the court relied on P.R. Laws Ann. tit. 19, § 2240, which defines a "request for an accounting" as a "record authenticated by the debtor requesting that the recipient provide an accounting of the unpaid obligations secured by collateral." P.R. Laws Ann. tit. 19, § 2240(a)(2).  As the text makes clear, this provision concerns a <u>debtor's</u> request for an accounting, not a <u>creditor's</u> request for an accounting.  Moreover, the definition of "request for an accounting" that appears in section 2240 is expressly limited to that section.  <u>Id.</u> § 2240(a).

Second, the court relied on our holding in <u>Citibank Global Markets, Inc.</u> v. <u>Rodríguez Santana</u>, 573 F.3d 17 (1st Cir. 2009).  There, an account holder sued a broker-dealer, broadly alleging overcharging of commissions.  <u>Id.</u> at 21–22.  The account holder alleged the broker-dealer had fraudulently induced him to sign a settlement agreement concerning those overcharges.  <u>Id.</u> at 29.  He argued that the settlement would only have been valid if the broker-dealer (acting as his agent) had "provide[d] an

accounting of its . . . overcharges." Id. at 30. The broker-dealer had, in fact, provided a "detailed forty-plus page analysis of the overcharges." Id. at 30. The Citibank court did not pass on whether such an accounting was, in fact, required. It simply held that, if an accounting were required, nothing in Puerto Rico law suggested that the broker-dealer's analysis was insufficient. Id. Thus, Citibank did not define the remedy of "accounting" under Puerto Rico law. And even if it did define that remedy, it did so in the context of agency law, not secured transactions. Id. Citibank therefore provides little guidance here.

To conclude, the Bondholders have properly pled a claim for an equitable accounting. That said, we emphasize, as the Board correctly does, that any equitable accounting will not expand the Bondholders' recourse beyond the Net Revenues. Under the Authority Act, a claim for an equitable accounting is subject to the terms of the Trust Agreement. P.R. Laws Ann. tit. 22, § 208(a). And as discussed above, sections 804 and 805 of the Trust Agreement state that in any legal or equitable action to enforce payment of the Revenue Bonds, the Bondholders may only reach moneys available for debt service. Thus, while the Bondholders stated a claim for an accounting under the Authority Act, that claim will not entitle them to reach any moneys or funds in which they do not already hold a security interest.

**VII.**

For the foregoing reasons, the judgment of the Title III court is <u>affirmed in part</u> and <u>reversed in part</u>.  All parties shall bear their own costs.